IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LEO GIBNEY, | : | |
| | : | |
| Plaintiff, | : | |
| v. | : | |
| | : | CIVIL ACTION |
| | : | NO. 14-1913 |
| | : | |
| EVOLUTION MARKETING | : | |
| RESEARCH, LLC, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

## MEMORANDUM OPINION

Tucker, C. J.                                                                                                          June 10, 2014

      Presently before the Court is Defendant Evolution Market Research, LLC's Motion to Dismiss the Complaint (Doc. 3), Plaintiff Leo Gibney's Response in Opposition thereto (Doc. 5), and Defendant's Reply (Doc. 8). Upon consideration of the parties' briefs, and for the reasons set forth below, Evolution's Motion to Dismiss will be granted.

      **I.**       **FACTUAL AND PROCEDURAL BACKGROUND**

      Plaintiff Leo Gibney ("Plaintiff") brings this action against his former employer, Defendant Evolution Market Research, LLC ("Evolution"), for wrongful termination in violation of the Sarbanes–Oxley Act's ("SOX") whistleblower protection provision. Taking the allegations of the Complaint as true, the facts are as follows.

      Plaintiff was employed by Evolution, a "marketing research and consulting company" located in Blue Bell, Pennsylvania, between October 2009 and November 7, 2011. (Compl. ¶¶ 1-2.) Plaintiff alleges that Evolution terminated his employment after he "report[ed] to Evolution's chief operating officer and general counsel his reasonable belief that a plan approved by

[Evolution's] principals would result in the fraudulent billing" of Evolution's client Merck & Co., Inc. ("Merck"), a "public-traded company to which Evolution was a contractor." (Id. ¶ 3.) Specifically, Plaintiff avers that "Evolution's contract with Merck distinguishes between two types of fees: (1) professional fees; and (2) out-of-pocket fees passed through to Merck." (Id. ¶ 7.) The contract allegedly states that Evolution's professional fees "for quantitative research projects, which have been pre-negotiated and appear on a rate card, must include" professional services such as data collection, data management, and data processing." (Id. ¶ 8.) Plaintiff states that Evolution subcontracted these services out to other companies. (Id. ¶ 9.) However, Plaintiff claims that although these services should be included under professional fees pursuant to the contract, Evolution does not pay its subcontractors for these services under its professional fees; rather, "Evolution improperly passes these costs on to Merck as part of Evolution's 'out-of-pocket' fees, hiding these fees as 'other[,]'" in "clear violation of the contract." (Id.)

Plaintiff states he learned of this improper billing in October 2011 while bidding on a Merck project known as Cogent. (Id. ¶ 10.) Plaintiff was awarded the project, and became the "sole authorized Evolution agent on the Cogent project." (Id.) Plaintiff claims that he entered costs for the Cogent project in accordance with the contract on a Merck website and approved invoices sent to Merck, but that Evolution subsequently "reallocated" the distribution of costs for the project by (1) reducing certain pass-through costs and (2) using those savings to pay other market research vendors for tasks that Evolution was required, under the contract, to perform itself. (Id. ¶¶ 11-12.)

Plaintiff maintains that the contract states the fees for these services is already included in Evolution's professional fees; thus, Evolution is required to pay its subcontractors out of its own professional fees. (Id. ¶ 13.) By passing these costs through to Merck as "other," Plaintiff claims Evolution is effectively double billing Merck. Plaintiff further claims that this reallocation was

detailed in an Excel spreadsheet created by an Evolution employee; that he was told by Evolution not to modify the costs for the Cogent project on Merck's website after the spreadsheet was created; and that he was subsequently terminated on November 7, 2011, two days after reporting his objections to the reallocation to Evolution's chief operating officer and general counsel. (Id. ¶¶ 11, 17-20.)

Plaintiff filed an administrative complaint with the Occupational Safety and Health Administration ("OSHA") on January 23, 2012. (Id. ¶4.) Plaintiff subsequently filed the instant *pro se* Complaint in the Eastern District of Pennsylvania on April 1, 2014, averring that OSHA's failure to take action on his administrative complaint within 180 days permitted him to file a *de novo* complaint in a federal district court.

## II.     STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6), the court is required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party. See Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d 1380, 1384 (3d Cir. 1994). A complaint should be dismissed only if the alleged facts, taken as true, fail to state a claim. See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397-98 (3d Cir. 2000). The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

While a court will accept well-pleaded allegations as true for the purposes of the motion, it will not accept bald assertions, unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. Morse v. Lower Merion Sch. Dist., 132

F.3d 902, 906 (3d Cir. 1997). The United States Supreme Court has recognized that "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original). In Twombly, the Court made clear that it would not require a "heightened fact pleading of specifics," but only "enough facts to state a claim to relief that is plausible on its face." Id. at 570. A "pleader is required to 'set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist.'" Kost v. Kozakiewicz, 1 F.3d 176, 183 (3d Cir. 1993) (citations omitted).

In 2009, the United States Supreme Court revisited the requirements for surviving a 12(b)(6) motion to dismiss in Ashcroft v. Iqbal, 556 U.S. 662 (2009). In Iqbal, the Court made clear that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements [will] not suffice" to defeat a Rule 12(b)(6) motion to dismiss. Id. at 663. "[O]nly a complaint that states a plausible claim for relief [will] survive[] a motion to dismiss." Id. at 679.

In light of the decision in Iqbal, the Third Circuit set forth a two-part analysis to be applied by district courts when presented with a 12(b)(6) motion. First, the court must separate the legal elements and factual allegations of the claim, with the well-pleaded facts accepted as true but the legal conclusions disregarded. Fowler v. UPMC Shadyside, 578 F.3d 203, 210-11 (3d Cir. 2009). Second, the court must determine whether the facts alleged in the complaint demonstrate that the plaintiff has a "plausible claim for relief." Id. at 211 (citation omitted). If the court can only infer the mere possibility of misconduct, the complaint must be dismissed because it has alleged, but has failed to show, that the pleader is entitled to relief. Id.

## III.   DISCUSSION

The central question in resolving the instant motion to dismiss is whether Plaintiff is protected person under SOX, and thus whether his reporting of his objections to the alleged reallocation to Evolution's chief operating officer and general counsel are protected activities under SOX.  SOX provides, in relevant part:

**Civil action to protect against retaliation in fraud cases**

> **(a) Whistleblower protection for employees of publicly traded companies.**-- No company with a class of securities registered under section 12 of the Securities Exchange Act of 1934 (15 U.S.C. 78*l*), or that is required to file reports under section 15(d) of the Securities Exchange Act of 1934 (15 U.S.C. 78*o*(d)) including any subsidiary or affiliate whose financial information is included in the consolidated financial statements of such company, or nationally recognized statistical rating organization (as defined in section 3(a) of the Securities Exchange Act of 1934 (15 U.S.C. 78c), or any officer, employee, contractor, subcontractor, or agent of such company or nationally recognized statistical rating organization, may discharge, demote, suspend, threaten, harass, or in any other manner discriminate against an employee in the terms and conditions of employment because of any lawful act done by the employee--
>
>> **(1)** to provide information, cause information to be provided, or otherwise assist in an investigation regarding any conduct which the employee reasonably believes constitutes a violation of section 1341, 1343, 1344, or 1348, any rule or regulation of the Securities and Exchange Commission, or any provision of Federal law relating to fraud against shareholders, when the information or assistance is provided to or the investigation is conducted by [a federal agency, Congress, or supervisor]….

18 U.S.C. § 1514A.[1]  In the instant matter, it is undisputed that Evolution is not a publicly-traded company.  However, Plaintiff contends that as an employee of a contractor to a publicly-traded company and pursuant to the Supreme Court's recent decision in <u>Lawson v. FMR LLC</u>, 134 S. Ct. 1158, 188 L. Ed. 2d 158 (2014), his activities were protected under §1514A.

---

[1] Plaintiff's Complaint and Response in Opposition refer to this provision as § 806.  Section 806, the session law to which Plaintiff refers, added a new provision to Title 18 of the United States Code. § 806, 116 Stat. 802 (codified as 18 U.S.C. § 1514A).  This opinion will refer to this provision as §1514A.

In Lawson, two former employees (Lawson and Zang) of private companies that contracted to advise or manage Fidelity mutual funds brought separate actions against their former employers, alleging the employers unlawfully retaliated against them in violation of §1514A. Id. at 1161. Lawson alleged that she was constructively discharged after raising concerns that certain cost accounting methodologies overstated the expenses associated with operating the mutual funds. Id. at 1164. Zang alleged that he was fired in retaliation for raising concerns about inaccuracies in a draft for a registration statement to be filed with the Securities and Exchange Commission ("SEC"). Id. The defendant privately-held advisory and management firms contended that §1514A was limited to protecting employees of a publicly-traded company from retaliation by the company's private contractors or subcontractors. The Supreme Court rejected this contention. Specifically, the Supreme Court held that "based on the text of § 1514A, the mischief to which Congress was responding, and earlier legislation Congress drew upon, [§1514A] shelters employees of private contractors and subcontractors [of publicly-traded companies], just as it shelters employees of the public company served by the contractors and subcontractors." Id. at 1158.

With respect to the text of §1514A, the Supreme Court ruled that a plain, common sense reading of § 1514A leads to the conclusion that "[n]o ... contractor ... may ... discriminate against [its own] employee [for whistleblowing]." Id. at 1161. In so holding, the Supreme Court reasoned that Congress did not intend "to stop a contractor from retaliating against whistleblowers employed by the public company the contractor serves, while leaving the contractor free to retaliate against its own employees when they reveal corporate fraud." Id. at 1161-62; see also id. at 1166 ("[N]othing in § 1514A's language confines the class of employees protected to those of a designated employer. Absent any textual qualification, we presume the

6

operative language means what it appears to mean: A contractor may not retaliate against its own employee for engaging in protected whistleblowing activity.")

With respect to the earlier legislation which Congress drew upon in drafting SOX, the Supreme Court noted that Congress "borrowed § 1514A's prohibition against retaliation from the wording of the 2000 Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR 21), 49 U.S.C. § 42121,"[2] which had been enacted two years earlier. Id. at 1162, 1164. The Supreme Court observed §42121 has itself been read to protect the employees of contractors covered by that provision, and that the Department of Labor's regulations adopting this interpretation of §42121 predated the enactment of §1514A. Id. at 1175-76 (collecting Administrative Review Board cases and reviewing regulations). The Supreme Court further noted that the Senate Report for AIR also supported this reading. Id. at 1176.

It is obvious, however, that in finding that the Lawson plaintiffs were covered by SOX, the Supreme Court primarily relied on SOX's overarching goal of preventing future fraud by public companies, as well as the unusual structure of mutual funds (which generally have no employees). The Supreme Court first emphasized that SOX was enacted in the aftermath of the Enron scandal:

> In the Enron scandal that prompted the Sarbanes–Oxley Act, contractors and subcontractors, including the accounting firm Arthur Andersen, *participated in* Enron's fraud and its coverup. When employees of those contractors attempted to bring misconduct to light, they encountered retaliation by their employers. The Sarbanes–Oxley Act [thus] contains numerous provisions aimed at controlling the conduct of accountants, auditors, and lawyers who work with public companies.

Id. at 1162 (emphasis added). Accordingly, the Supreme Court held that given Congress' clear

---

[2] AIR 21 provides, in relevant part: "No air carrier or contractor or subcontractor of an air carrier may discharge an employee or otherwise discriminate against an employee with respect to compensation, terms, conditions, or privileges of employment" when the employee provides information regarding violations "relating to air carrier safety" to his or her employer or federal authorities. 49 U.S.C. § 42121(a)(1).

"concern about contractor conduct of the kind that *contributed to* Enron's collapse," it "regard[ed] with suspicion construction of § 1514A to protect whistleblowers only when they are employed by a public company, and not when they work for the public company's contractor." Id. (emphasis added); see also id. at 1169 ("Congress plainly recognized that outside professionals—accountants, law firms, contractors, agents, and the like—were *complicit in*, if not integral to, the shareholder fraud and subsequent cover-up [Enron] officers ... perpetrated.") (quoting Spinner v. David Landau & Assoc., LLC, No. 10–111 etc., ALJ No. 2010–SOX–029, pp. 12-13 (May 31, 2012)) (emphasis added); id. ("Indeed, the Senate Report demonstrates that Congress was as focused on the role of Enron's outside contractors in *facilitating* the fraud as it was on the actions of Enron's own officers.") (internal citations omitted) (emphasis added). The Supreme Court further observed that the legislative record clearly demonstrated "Congress' understanding that outside professionals bear significant responsibility for reporting *fraud by the public companies with whom they contract*, and that fear of retaliation was the primary deterrent to such reporting by the employees of Enron's contractors." Id. at 1170 (emphasis added).

Given these legislative concerns, the Supreme Court noted that if the Lawson plaintiffs were not covered by §1514A, this would "insulat[e] the entire mutual fund industry from §1514A," because "[v]irtually all mutual funds are structured so that they have no employees of their own; they are managed, instead, by independent investment advisers." Id. at 1171. But given the vital role mutual funds play in filing reports to the SEC, the Supreme Court concluded that such insulation could not have been Congress' intent. Id. at 1171 ("Because mutual funds figure prominently among such report-filing companies, Congress presumably had them in mind when it added to 'publicly traded companies' the discrete category of companies" required to file reports."); see also id. at 1172 ("Indeed, affording whistleblower protection to mutual fund investment advisers is crucial to Sarbanes–Oxley's endeavor to protect investors by improving

the accuracy and reliability of corporate disclosures made pursuant to the securities laws.") (internal citation and quotation omitted). Consequently, the Court held that finding the <u>Lawson</u> plaintiffs to be covered under SOX furthered the statute's goals in preventing publicly-held companies from utilizing outside contractors (or related and controlled companies) to perpetuate fraud on shareholders.

In sum, it is clear that after <u>Lawson</u> whistleblower protection under SOX extends to employees of private contractors or subcontractors for a public company. Evolution, however, frames the issue more narrowly. Evolution contends that the "<u>Lawson</u> decision does not support extending SOX protection to employees of private companies who, as here, report overbilling 'fraud' neither committed by the public company nor having any connection to fraud on shareholders." (Def.'s Mot. Dismiss 6.) This is a novel argument, one which appears to present an issue of apparent first impression in the Third Circuit. As Evolution phrases it, "[t]his case now presents one of the 'limiting principle' questions that the Supreme Court in <u>Lawson</u> reserved for another day: Does the coverage that Plaintiff assumes in the Complaint — that SOX protects employees of private companies who contend that their employer overbilled a public company — go beyond that approved by <u>Lawson</u> or contemplated by the statute." (<u>Id.</u>) (citing <u>Lawson</u>, 134 S. Ct. at 1173). Evolution argues that because "Plaintiff does not allege that Evolution was assisting or otherwise involved with fraud committed *by* Merck, Plaintiff's Complaint should be dismissed as outside of SOX's scope." (<u>Id.</u>) (emphasis added).

The Court finds that that the issue of whether Plaintiff's claims fall outside the scope of SOX is a close question. As previously stated, the overarching goal of SOX is to prevent fraud against a public company's shareholders. If a public company is itself defrauded, then by extension its shareholders are defrauded. That is to say, if Evolution defrauds Merck through its accounting practices, then Evolution is defrauding Merck's shareholders. <u>Generally</u> speaking,

9

then, this case at least touches on Congress' central concern in enacting SOX: protecting shareholders.

Further, the Court cannot agree with Evolution that Plaintiff's allegations "in no way relate to fraud against shareholders, as was in the case in <u>Lawson</u>, where the fraud concerned misstatements in SEC registration statements." (<u>Id.</u> at 8.)  This argument is factually incorrect. <u>Lawson</u> did not, as Evolution claims, only concern "misstatements in SEC registration statements." (<u>Id.</u>) Only one of the plaintiffs in <u>Lawson</u>, Zang, alleged that he was terminated for "expressing concerns about inaccuracies in a draft registration statement [his private employer] prepared for the SEC on behalf of certain Fidelity funds." <u>Lawson</u>, 134 S. Ct. at 1173.  Lawson herself, however, alleged "that she was constructively discharged for reporting accounting practices that overstated expenses associated with managing certain Fidelity mutual funds." <u>Id.</u> A majority of the Supreme Court held that "[t]his alleged fraud directly implicates the funds' shareholders," because "[b]y inflating its expenses, and thus understating its profits, [Lawson's former employer] could potentially increase the fees it would earn from the mutual funds, fees ultimately paid by the shareholders of those funds." <u>Id.</u> (internal citation omitted).  The same logic applies in the instant case: by allegedly "passing through" additional professional fee costs to Merck as "others," Evolution would effectively be double billing Merck. These inflated costs would ultimately be paid by Merck's shareholders, as in Lawson's case.

Nonetheless, the Court concludes that Plaintiff advocates for an impermissibly broad definition of SOX protection that was neither intended by Congress nor contemplated by the Supreme Court in <u>Lawson</u>.  First, although there are some factual similarities between Plaintiff's claim and Lawson's claim, Plaintiff case is fundamentally different in that it does not implicate the peculiar structure of the mutual fund industry.  As previously detailed, it is clear that the <u>Lawson</u> decision was partially motivated by the fact that the unusual structure of the mutual fund

10

industry meant that "*all* of the potential whistleblowers [of fraudulent activity related to the funds] are employed by the privately held investment management companies, not by the mutual funds themselves." Id. at 1171-72 (emphasis added).  Here, it is not the case that denying coverage to Plaintiff would "insulate" an entire industry from §1514A protection. Id. at 1160.

More importantly, in enacting SOX Congress was specifically concerned with preventing shareholder fraud either by the public company itself or *through* its contractors.  In incorporating contractors as a protected class under the §1514A, Congress recognized that these contractors could "contribute to," "facilitate," and be "complicit in" shareholder fraud and any subsequent cover-up. Id. at 1162, 1169-70.  Here, however, Plaintiff has not alleged that he blew the whistle on fraud committed *by* Merck (either acting on its own or acting through contractors like Evolution).  Rather, Plaintiff is alleging that Evolution committed fraud *against* Merck.  Thus, based on Plaintiff's allegations, Merck is the victim of fraud rather than its perpetrator.  Nothing in the text of §1514A or the Lawson decision suggests that SOX was intended to encompass *every* situation in which any party takes an action that has some attenuated, negative effect on the revenue of a publicly-traded company, and by extension decreases the value of a shareholder's investment.  As Evolution argues, extending SOX's protections in this way presents obvious "overbreath" concerns that risk "mak[ing] SOX a general anti-retaliation statute applicable to any private company that does business with a public company." (Def.'s Mot. Dismiss 6-7); see also Safarian v. Am. DG Energy Inc., No. 10-6082, 2014 WL 1744989, at *5 (D.N.J. Apr. 29, 2014) ("[A]pplying the Sarbanes–Oxley Act to any fraudulent actions that might lead to misstatements in the accounting records or tax submissions would unduly expand the Act to a general anti-retaliation statute. If the actions alleged here [which included alleged overbilling] sufficiently relate to fraud against shareholders, it is difficult to foresee an illegal act which would not fall under the purview of the Sarbanes–Oxley Act.")  Rather, the specific shareholder

fraud contemplated by SOX is that in which a public company —either acting on its own or acting through its contractors — makes material misrepresentations about its financial picture in order to deceive its shareholders.  See e.g. Harvey v. Safeway, 2005 WL 4889073, at *3 (Dept. of Labor Feb. 11, 2005) (SOX "was not intended to capture every complaint an employee might have as a potential violation of the Act.  Rather, the goal of the legislation was to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to the securities laws.") (internal quotations omitted).  Accordingly, the Court does not believe SOX was not intended to reach the type of scenario at issue here: where there are allegations of fraudulent conduct between two companies who are party to a contract, and one of those companies just happens to be publicly-held.

Finally, the Court finds relevant the belated Secretary's Findings issued by OSHA in this matter on May 9, 2014.[3] (Def.'s Reply, Ex. A.)  OSHA determined that Evolution was not a covered employer under SOX and that Plaintiff was not a covered employee. (Id. at 2-3.) Accordingly, OSHA dismissed the complaint, finding that Plaintiff  "cannot engage in a protected activity under the [A]ct if [Evolution] is not a covered employer or he is not a covered employee." (Id. at 3.) Thus, although OSHA's decision is limited in detail and analysis, it appears that OSHA — the agency charged with enforcing SOX — agrees that SOX does not extend to Evolution's alleged overbilling of Merck.

---

[3] "In deciding motions to dismiss pursuant to Rule 12(b)(6), courts generally consider only the allegations of the complaint, exhibits attached to the complaint, matters of public record, and documents that form the basis of a claim." Lum v. Bank of America, 361 F.3d 217, 222 n. 3 (3d Cir. 2004); see also W. Penn Allegheny Health Sys., Inc. v. UPMC, 627 F.3d 85, 97 n. 6 (3d Cir.2010) (citing In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir.1997) (stating that a court may consider matters extraneous to the pleadings that are "integral to or explicitly relied upon in the complaint").  OSHA's Secretary's Findings may be considered by the Court in resolving the instant motion for two reasons.  First, it is a matter of public record.  Secondly, Plaintiff cites his OSHA filing, the agency's investigation, and the then lack of determination in his Complaint. (See Compl. ¶ 4-6.)

Additionally, it appears that OSHA issued its Secretary's Findings just three days before Evolution filed its Motion to Dismiss.  Evolution avers it received the Findings after it filed its Motion to Dismiss (Def.'s Reply 5.)

## IV.    CONCLUSION

For the reasons set forth above, Defendant Evolution Market Research, LLC's Motion to Dismiss the Complaint is granted.  An appropriate order follows.